*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JUSTIN LLOYD HUGHES,

        Defendant-Appellant.

UNPUBLISHED
July 23, 2019

No. 339441
Saginaw Circuit Court
LC No. 16-042711-FC

Before: O'BRIEN, P.J., and FORT HOOD and CAMERON, JJ.

PER CURIAM.

Following a jury trial, defendant, Justin Lloyd Hughes, was convicted of assault with a dangerous weapon (felonious assault), MCL 750.82, assaulting/resisting/obstructing a police officer, MCL 750.81d, felon in possession of a firearm (felon-in-possession), second offense, MCL 750.224f, felon in possession of ammunition, MCL 750.224f, and three counts of use of a firearm during the commission of a felony (felony-firearm), second offense, MCL 750.227b. The jury did not reach a verdict on a charge of open murder, MCL 750.316, felon in possession of a firearm, carrying a dangerous weapon with unlawful intent, MCL 750.226, and three additional counts of felony-firearm. Hughes was initially sentenced as a habitual offender, fourth offense, MCL 769.12, to concurrent terms of 5 to 15 years' imprisonment for the felonious assault and resisting a police officer convictions and 5 to 30 years' imprisonment for each of the felon-in-possession convictions. Those sentences were to be served consecutive to five-year concurrent sentences for each of the felony-firearm convictions. Following a remand by this Court,[1] the trial court resentenced Hughes, amending the sentence for the felon in possession of a firearm conviction to 5 to 10 years' imprisonment, and the felon in possession of ammunition conviction to 10 to 15 years' imprisonment.

---

[1] See *People v Hughes*, unpublished order of the Court of Appeals, entered April 27, 2018 (Docket No. 339441).

Hughes then appealed and filed with this Court a Standard 4 Brief, together with a second motion to remand to correct statements in his presentence investigation report (PSIR). This Court granted the motion "for the limited purpose of allowing [Hughes] to bring a motion to request the trial court to correct alleged inaccurate statements or other errors in the presentence investigation report as mentioned by [Hughes] in his pro per motion to remand." *People v Hughes*, unpublished order of the Court of Appeals, entered July 24, 2018 (Docket No. 339441). On remand, the PSIR was amended, and Hughes indicated that he was satisfied with the amended PSIR.

## I. FACTUAL BACKGROUND

Hughes was at a house party where partygoer Jefferey Reynolds was shot and killed. Several hours after the shooting, Michigan State Police Detective Sergeant James Bush (Sergeant Bush) was traveling to the scene of the shooting in an unmarked police vehicle.[2] Approximately two blocks from the scene of the shooting, Sergeant Bush saw Hughes walking on the side of the street. Sergeant Bush testified that as he slowed his vehicle, Hughes approached "like he wanted to make contact with me." Sergeant Bush noticed that as Hughes walked toward him, Hughes's right hand was tucked behind his leg "like he was hiding something." Hughes approached the vehicle and spoke with Sergeant Bush through the passenger side window. According to Sergeant Bush, Hughes continued to conceal his right hand behind his body. While at the side of the car, Sergeant Bush's concern for his safety was heightened because Hughes began looking around the interior of the car, conduct Sergeant Bush believed was intended to determine whether he was alone in the vehicle. Concerned that Hughes was involved in the shooting or that he was about to be carjacked, Sergeant Bush identified himself as a police officer and ordered Hughes to show his hands.[3] Hughes did not respond or comply; he just stared at Sergeant Bush. Sergeant Bush then pulled his firearm, pointed his gun at Hughes through the passenger-side window, and twice ordered Hughes to show his hands. Hughes did not comply; instead he stopped leaning into the vehicle, stood up, and backed away.

At this moment, Sergeant Bush heard a "tap, tap, tap" on his driver's side window, which he believed was the sound of a gun barrel. While keeping his weapon leveled at Hughes, Sergeant Bush "rolled his eyes back" toward the tapping sound behind him and saw the tip of an assault rifle pointed at the back of his head by a person later identified as Paris Culpepper. Sergeant Bush pulled his vehicle forward to create distance between him and the two other men. As Sergeant Bush drove away, he saw Hughes and Culpepper in his rear view mirror "come together." After pulling forward some distance, Sergeant Bush called for police backup, and he turned his vehicle around to keep visual contact with Hughes and Culpepper who were walking in the opposite direction. As the two men walked away together, Sergeant Bush used the headlights of his vehicle to track their movements. Before losing visual contact, Sergeant Bush heard a gunshot from the direction of Hughes and Culpepper. Sergeant Bush then saw the two

---

[2] Sergeant Bush testified that he encountered defendant on the street at approximately 4:55 a.m.

[3] Sergeant Bush was wearing a shirt with a State Police emblem on the chest and a badge on his belt.

walk off together between two nearby houses. After witnesses from the house party identified Hughes as the shooter, the police searched his home and found a pistol and ammunition.

Hughes testified at trial. He acknowledged that he was at the house party where the shooting occurred, but denied having a gun or being involved in the murder. According to Hughes, after the shooting he returned to his home a short distance away and was later joined by Culpepper, who wanted to discuss the shooting. While discussing what happened, Hughes received a telephone call from someone who accused Hughes of being involved in Reynold's murder, which Hughes interpreted as a death threat. Shortly before 5 a.m., the two men left so that Hughes could give Culpepper a ride home. According to Hughes, they walked in the street in the direction of a home "around the corner" to get his car. Before reaching the car, Hughes recalled encountering a vehicle that was driving slowly, which concerned him because he was worried that it could be someone wanting to retaliate for Reynolds's murder. Hughes was less concerned when he saw that the driver was an older man, and Hughes walked over when the vehicle stopped. Hughes claimed that the driver almost immediately pointed a gun at him and that Hughes complied with the demand to raise his hands. Hughes, like Sergeant Bush, heard a "tap, tap, tap" on the window, but Hughes testified that he did not see Culpepper with a firearm, which he described as a handgun, until after Sergeant Bush pulled his vehicle forward. Contrary to the officer's testimony, Hughes testified that no shots were fired in the street, and Hughes claimed that he took off running after the encounter and cut through several nearby yards.

Hughes's assault and weapon convictions were the result of his encounter with Sergeant Bush and the subsequent search of Hughes's home. Although Hughes was charged with the murder of Reynolds and crimes directly related to the murder, the jury did not reach a verdict on those charges.

## II. SUFFICIENCY OF THE EVIDENCE

Hughes first argues that the evidence was insufficient to convict him of assault with a dangerous weapon and felon in possession of a firearm relative to his interaction with Sergeant Bush. We disagree.

The due process clause, US Const, Am XIV, requires that evidence of every element of a crime be proved beyond a reasonable doubt in order to sustain a criminal conviction. *People v Hampton*, 407 Mich 354, 366; 285 NW2d 284 (1979), citing *In re Winship*, 397 US 358, 363-364; 90 S Ct 1068; 25 L Ed 2d 368 (1970). This Court reviews de novo a challenge to the sufficiency of the evidence. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). To determine if the prosecutor produced evidence sufficient to support a conviction, this Court considers "the evidence in the light most favorable to the prosecutor" to ascertain "whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010), quoting *People v Hardiman*, 466 Mich 417, 421; 646 NW2d 158 (2002). Direct and circumstantial evidence, as well as all reasonable inferences that may be drawn, are considered to determine whether the evidence was sufficient to sustain the defendant's conviction. *Hardiman*, 466 Mich at 429.

The elements of felonious assault are: "(1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate

-3-

battery." MCL 750.82(1); *People v Chambers*, 277 Mich App 1, 8; 742 NW2d 610 (2007). A defendant commits an assault when there is "an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v Meissner,* 294 Mich App 438, 453-454; 812 NW2d 37 (2011) (citation and quotation marks omitted). A battery is "an intentional, unconsented and harmful or offensive touching of the person of another. . . ." *Id.* at 454 (citation and quotation marks omitted).

There was ample evidence that Culpepper assaulted Sergeant Bush with a firearm. According to Sergeant Bush, a rifle was pointed at his head, which caused him to fear that he might be shot. Hughes identified Culpepper as the person with a firearm. Thus, there was sufficient evidence to support that Sergeant Bush was assaulted with a dangerous weapon.

While there may not have been sufficient evidence to conclude that Hughes possessed a firearm during the encounter in the street, reasonable inferences from the evidence support the jury's conclusion that Hughes aided and abetted Culpepper in his felonious assault of Sergeant Bush. Accomplices to crimes may be prosecuted as if they committed the crime under the theory that they aided and abetted the crimes. *People v Robinson*, 475 Mich 1, 5-6; 715 NW2d 44 (2006). The trial court instructed the jury regarding the elements of felonious assault and aiding and abetting. A conviction under an aiding and abetting theory requires that "(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement." *Id*. (quotation marks and citation omitted).

Hughes argues that there was no evidence that he signaled to Culpepper or was aware that Culpepper intended to assault Sergeant Bush. Therefore, Hughes claims that he was not actively aiding and abetting Culpepper in the assault. While a defendant's "mere presence" is not sufficient to establish that the defendant aided and abetted a crime, even where the defendant was aware that the crime was being committed, *People v Norris*, 236 Mich App 411, 419-420; 600 NW2d 658 (1999), citing *People v Wilson*, 196 Mich App 604, 614; 493 NW2d 471 (1992), an accomplice's "state of mind may be inferred from all the facts and circumstances." *People v Carines*, 460 Mich 750, 758; 597 NW2d 130 (1999) (citation omitted). "[B]ecause it can be difficult to prove a defendant's state of mind on issues such as knowledge and intent, minimal circumstantial evidence will suffice to establish the defendant's state of mind, which can be inferred from all the evidence presented." *People v Kanaan*, 278 Mich App 594, 622; 751 NW2d 57 (2008). Factors to consider when determining whether a defendant aided and abetted a crime "include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *Carines*, 460 Mich at 758 (citation omitted). This Court "is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Gonzalez*, 468 Mich 636, 640-641; 664 NW2d 159 (2003), citing *People v Nowack*, 462 Mich 392, 399-400; 614 NW2d 78 (2000).

When considering all reasonable inferences from the evidence, we conclude the jury could find that Hughes coordinated his actions with Culpepper in order to accomplish the assault on Sergeant Bush. Specifically, the jury could conclude that Hughes manipulated Sergeant

Bush's actions by engaging the officer and presenting a prolonged encounter until Culpepper was able to establish a dominant position with a firearm, which was proof of his assistance in, and knowledge of, the felonious assault.

There are a number of small, but reasonable, inferences that aid us in reaching this conclusion. First, the jury could reasonably infer that Hughes was aware of Culpepper's assault rifle because it would be unrealistic to find that Culpepper kept the long rifle concealed from Hughes while they were at Hughes's home or while they were walking together before the encounter with Sergeant Bush. Second, Hughes said that he was walking with Culpepper, but Sergeant Bush testified that he saw only Hughes as he approached the officer's car, raising an inference that Hughes and Culpepper were walking separately when they spotted Sergeant Bush, allowing the two men to execute the assault. Third, testimony from Sergeant Bush supports the jury's finding that Hughes either hid that he had a weapon from Sergeant Bush, or acted as if he had a weapon, which would have drawn Sergeant Bush's attention to Hughes as he walked up to the vehicle and while he continued to act as if he had a weapon. Once at the vehicle, Hughes did not respond to Sergeant Bush's demands that he show his hands, even when Sergeant Bush identified himself as a police officer and pointed his firearm at Hughes. Another reasonable inference the jury could draw from the testimony is that Hughes was continuing to command Sergeant Bush's attention while Culpepper approached undetected and that Hughes was undeterred by the officer's instructions either because Hughes himself was armed or he knew Culpepper was approaching the vehicle. By the time Hughes told Sergeant Bush that he had no conflict with him and moved away, Culpepper was able to surprise Sergeant Bush and maintain a threatening position such that Sergeant Bush was not in a position to defend himself. Hughes's actions made Sergeant Bush vulnerable to Culpepper's superior position to assault the officer, and a jury could reasonably infer Hughes's intent to aid Culpepper in the assault. Thus, the evidence, and all of the reasonable inferences taken from the evidence, when viewed in a light most favorable to the prosecution, demonstrate that a rational juror could have found Hughes guilty beyond a reasonable doubt of felonious assault based on a theory of aiding and abetting.

Hughes argues correctly that the evidence pertaining to the assault of Sergeant Bush did not support Hughes's conviction of felon in possession of a firearm. The elements of felon in possession of a firearm are: "(1) the defendant is a felon who possessed a firearm (2) before his right to do so was formally restored." *People v Bass*, 317 Mich App 241, 267-268; 893 NW2d 140 (2016), citing *People v Perkins*, 473 Mich 626, 629; 703 NW2d 448 (2005). Sergeant Bush did not see Hughes in possession of a firearm during their interaction. However, the handgun found during the search of Hughes's home supported the conviction. "[A] defendant has constructive possession of a firearm if the location of the weapon is known and it is reasonably accessible to the defendant." *People v Burgenmeyer*, 461 Mich 431, 438; 606 NW2d 645 (2000).

Hughes also argues that the interaction with Sergeant Bush did not support a felony-firearm conviction. "The elements of felony-firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony." *Bass*, 317 Mich App at 268-269, citing *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999). Because the evidence did not demonstrate beyond a reasonable doubt that Hughes possessed a firearm during his interaction with Sergeant Bush, a rational juror could not have found that Hughes was guilty beyond a reasonable doubt of felony-firearm related to his resisting and obstructing conviction,

or based on a theory that Hughes was the principal actor for felonious assault against Sergeant Bush. However, the jury could have convicted Hughes of felony-firearm related to his interaction with Sergeant Bush under a theory that he aided and abetted Culpepper's possession of a firearm while the two committed felonious assault on Sergeant Bush. In order to convict Hughes of aiding or abetting felony-firearm, the prosecutor had to prove that "a violation of the felony-firearm statute was committed by the defendant or some other person, that the defendant performed acts or gave encouragement that assisted in the commission of the felony-firearm violation, and that the defendant intended the commission of the felony-firearm violation or had knowledge that the principal intended its commission at the time that the defendant gave aid and encouragement." *People v Moore*, 470 Mich 56, 70–71; 679 NW2d 41 (2004). Here, the evidence supported the conclusion that Hughes coordinated his activities with Culpepper in order to facilitate the felonious assault on Sergeant Bush. To accomplish this assault, it was necessary that Culpepper possess a firearm during the assault. Hughes's participation demonstrated his knowledge that Culpepper would use a firearm to accomplish the assault. Accordingly, the evidence was sufficient to convict Hughes of felony-firearm.

## III. MOTION TO SEVER CHARGES

Next, Hughes argues that the trial court erred by denying his motion to sever his charges, which would have resulted in three different trials. We disagree.

This Court reviews de novo the question of law of whether Hughes's charges are related, and reviews the trial court's decision on a motion to sever for an abuse of discretion. *People v Girard*, 269 Mich App 15, 17; 709 NW2d 229 (2005) (citations omitted). The trial court does not abuse its discretion when it chooses an outcome within the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003).

The Court Rules provide trial courts with discretion to join or sever trials for related charges against a defendant. *People v Breidenbach*, 489 Mich 1, 14; 798 NW2d 738 (2011); see also MCR 6.120. A prosecutor may charge a defendant with more than one offense that can be consolidated in a single trial. MCR 6.120(A). A trial court may "join offenses charged" in multiple informations against a single defendant, or sever multiple charges filed in a single information against a defendant, "when appropriate to promote fairness to the parties and a fair determination of the defendant's guilt or innocence of each offense." MCR 6.120(B).

Hughes was charged with open murder, felon-in-possession, carrying a firearm with unlawful intent, and three counts of felony-firearm in relation to the events that occurred at the house party where Reynolds was murdered. He was charged with assault with a dangerous weapon, resisting a police officer, and felony-firearm in relation to the encounter with Sergeant Bush. Finally, he was charged with felon in possession of a firearm, felon in possession of ammunition, and two counts of felony-firearm as a result of the execution of a search warrant at his residence.

Hughes first argues that the charges related to the murder of Reynolds should have been severed from the other charges because they were not related to the events that resulted in the rest of the charges. A defendant has an absolute right to severance of charges that are unrelated. MCR 6.120(C) ("On the defendant's motion, the court must sever for separate trials offenses that

-6-

are not related as defined in subrule (B)(1).").  Hughes argues that the charges pertaining to the felonious assault on Sergeant Bush could not have been related to the murder of Reynolds because of the change in circumstances and the passage of time—Hughes had left the scene of the shooting and time had passed before he encountered Sergeant Bush in a different location. However, MCR 6.120(B) defines "related" for purposes of joinder as follows:

> (1) Joinder is appropriate if the offenses are related.  For purposes of this rule, offenses are related if they are based on
>
> > (a) the same conduct or transaction, or
> >
> > (b) a series of connected acts, or
> >
> > (c) a series of acts constituting parts of a single scheme or plan.
>
> (2) Other relevant factors include the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of charges or the complexity or nature of the evidence, the potential for harassment, the convenience of witnesses, and the parties' readiness for trial.

Here, the charges were related because they were based on a series of connected acts.  MCR 6.120(B)(1)(b).  After Reynolds's murder, Hughes went home where he spoke on the phone to several individuals about the killing.  The discussion included references to threats that made Hughes fearful of retaliation for the murder.  Culpepper then came over to further discuss the murder.  Sergeant Bush, who was in the area because he was en route to the scene of the shooting, was driving slowly because he was looking for activity related to the murder.  Hughes reacted to Sergeant Bush's vehicle because he was worried that it might be occupied by someone who wished to retaliate for the murder.  Sergeant Bush heard a gunshot immediately after engaging with Hughes and Culpepper, and Michigan State Police Trooper Jared Chiros said that he was at the scene of Reynolds's murder when he heard the shot and that he was dispatched to respond to the shooting near Sergeant Bush.  The first 911 call regarding the conflict that resulted in Reynolds's murder was at 3:01 a.m., and the radio activity pertaining to the assault on Sergeant Bush was at 4:58 a.m.  While there was some passage of time between the two offenses, Hughes's encounter with Sergeant Bush was part of a series of connected events because it was within two hours of the shooting, it occurred in proximity to the location of the shooting such that the officers investigating the scene heard the gunshot, Sergeant Bush was actively investigating the murder when he engaged Hughes, and Hughes responded to Sergeant Bush based in part on his fear of retaliation for the murder.

As for the charges relating to the search of Hughes's home, Hughes asserts that the items located were not connected to either Reynolds's shooting or Sergeant Bush's assault.  The search was obviously related to the murder charges because it was executed to attempt to locate evidence of Reynolds's murder.  Hughes argues that it was unfair to join the charges because the jury may have decided that Hughes did something wrong based on the sheer number of charges.  However, joinder of the charges was proper because they were related, and there was no evidence that the jury was confused by the number of charges, as mentioned in MCR

6.120(B)(2). Thus, the trial court did not abuse its discretion by denying Hughes's motion to sever.

## IV. DEPARTURE SENTENCE

Hughes next argues that the sentence imposed on remand was unreasonable because it was a departure that was not justified by the trial court or the circumstances. We disagree.

"A sentence that departs from the applicable guidelines range will be reviewed by an appellate court for reasonableness." *People v Lockridge*, 498 Mich 358, 392; 870 NW2d 502 (2015), citing *United States v Booker*, 543 US 220, 261; 125 S Ct 738; 160 L Ed 2d 621 (2005). "Resentencing will be required when a sentence is determined to be unreasonable." *Lockridge*, 498 Mich at 392. This Court looks at whether the trial court's sentence violated the principles of reasonableness under the principle-of-proportionality test and reviews the departure sentence for an abuse of discretion. *People v Steanhouse*, 500 Mich 453, 471; 902 NW2d 327 (2017) (*Steanhouse II*).

When imposing a sentence, a court must use the applicable guidelines. MCR 6.425(D). The court must consult the guidelines, calculate the recommended guidelines range, and take that range into account when determining a sentence. *Lockridge*, 498 Mich at 391-392. However, while a court must score and consider the sentencing guidelines, the court is not compelled to impose a minimum sentence within the calculated range. *Id.* at 365. The court may depart from the guidelines range without stating substantial and compelling reasons to justify the departure; however, the trial court's sentence must be reasonable. *Id.* at 392.

Hughes argues that his sentence for the felon in possession of ammunition conviction was unreasonable because it was an upward departure from the guidelines. Although the trial court calculated the guidelines minimum sentence range at 10 to 46 months' imprisonment, it sentenced Hughes to serve 10 to 20 years' imprisonment for that conviction. Thus, Hughes's minimum sentence exceeded the ceiling of the guidelines minimum sentence range by 74 months (6 years and 2 months).

"[T]he principle of proportionality . . . require[s] sentences imposed by the trial court to be proportionate to the seriousness of the circumstances surrounding the offense and the offender." *Steanhouse II*, 500 Mich at 474, quoting *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990). This Court has recited several factors for consideration regarding the proportionality of a sentence, such as:

> (1) the seriousness of the offense, (2) factors that were inadequately considered by the guidelines, (3) factors not considered by the guidelines, such as the relationship between the victim and the aggressor, the defendant's misconduct while in custody, the defendant's expressions of remorse, and the defendant's potential for rehabilitation. [*People v Steanhouse*, 313 Mich App 1, 46; 880 NW2d 297 (2015) (*Steanhouse I*) (citations omitted).]

A trial court should also take "into account the nature of the offense and the background of the offender." *Id.* at 45, quoting *Milbourn*, 435 Mich at 651.

Hughes argues that the trial court departed from the guidelines because Hughes spoke "carelessly" to Reynolds's girlfriend after Reynolds's murder, telling her that Reynolds should have been dead a long time ago. The trial court also noted that Hughes "patrolled the street" after the murder rather than going home. Hughes maintains that these reasons were insufficient to justify an upward departure sentence. However, the trial court did not base its departure sentence solely on these reasons, but instead cited them as examples of how Hughes's crimes and behavior immediately after the murder were escalating an already volatile situation. The trial court cited more examples of Hughes's provocative behavior, such as approaching Sergeant Bush's vehicle, likely while hiding a weapon, refusing to comply with Sergeant Bush's orders to show his hands, aiding Culpepper in assaulting Sergeant Bush, and being involved with firing a gun after Sergeant Bush had driven away. Further, the court cited Hughes's recidivist history. Hughes does not dispute these facts, but attempts to minimize them. However, the trial judge was not relying on those facts alone as the basis for his departure, but on his determination that Hughes's actions compounded an already dangerous and volatile situation, which could have potentially resulted in the loss of another life.

Hughes also claims that the trial court improperly speculated that the ammunition found in Hughes's home was in Culpepper's rifle. The trial court stated that the ammunition found at Hughes's residence would have fit the assault rifle that Culpepper possessed; however, even though it was possible the ammunition was the same because Hughes and Culpepper had walked from Hughes's home together, the trial court did not state that it was basing its sentence on a finding that the ammunition was definitively used in the felonious assault on Sergeant Bush. The possibility that the ammunition from Hughes's home could have been used during the assault is an example of how Hughes's charges are intertwined and related to one another. Hughes argues that the trial court should not have considered evidence unrelated to the ammunition charge while sentencing Hughes. However, in determining a proportionate sentence, the sentencing court is required to evaluate the "seriousness of the circumstances surrounding the offense and the offender." *Steanhouse II*, 500 Mich at 474, quoting *Milbourn*, 435 Mich at 636. The trial court was merely articulating the seriousness of the circumstances surrounding the ammunition charge, which included the murder of Reynolds and the encounter with Sergeant Bush.

Even though Hughes's sentence was a significant departure from the guidelines range, the trial court soundly based the sentence on factors referred to in *Steanhouse I*, such as "the seriousness of the offense," "the defendant's potential for rehabilitation," and "factors that were inadequately considered by the guidelines in a particular case." *Steanhouse I*, 313 Mich App at 46. The trial court explicitly stated that the guidelines did not take into account "the dangerousness of the situation," which was "close to a very, very bad situation repeating itself that night." The trial court emphasized the probability of the loss of life that Hughes's actions made possible, contrasted with how he could have reacted to Reynolds's murder, specifically stating that the guidelines did not account for Hughes's contributions to the volatility of the series of events resulting in "how close this police officer may have come to dying, or they may have come to dying should anything have changed even slightly and people started firing." It should be noted that the offense variables considered for the sentencing offense, a crime against public safety, did not include assessing Offense Variable 2, which includes the lethal potential of a weapon. Additionally, the trial court mentioned Hughes's history of criminal convictions, implying the poor potential for rehabilitation. The trial court concluded that a departure sentence

was "proportionate to the incident that occurred with the officer, and the fact that they were out there waiting for something to happen after this murder had occurred," which referred to the actions of Hughes purposefully creating a risk of death. The trial court provided several examples of Hughes's actions, such as endorsing Reynolds's murder, leaving home and engaging Sergeant Bush with at least the appearance of a weapon, escalating the situation with Sergeant Bush by approaching his car and being uncooperative, distracting Sergeant Bush while Culpepper aimed a gun at Sergeant Bush, and firing a shot. These actions created more danger in an already volatile situation. Therefore, the court justified its determination that the upward departure from the advisory guidelines range was "proportionate to the seriousness of the circumstances surrounding the offense and the offender," *Steanhouse II*, 500 Mich at 474, and did not abuse its discretion because Hughes's sentence was reasonable.

## V. MATTERS ADDRESSED ON REMAND

Hughes raised additional issues with regard to his initial sentence that were addressed on remand. Accordingly, those issues are not addressed here. On separate remand, the trial court addressed references in the PSIR to Reynolds's murder. The PSIR referenced Hughes's involvement in Reynolds's murder and stated that the jury could not reach a verdict relative to these charges and that charges related to the murder were still pending against Hughes. Apparently, it was determined that someone else had committed the murder, and the charges against Hughes were dropped. The PSIR was amended and, on remand, Hughes indicated he was satisfied with the amendment. However, while the agent's description of offense in the PSIR was amended to delete any reference to Hughes's involvement in the circumstances of Reynolds's murder, including inaccuracies alleged by Hughes, and the evaluation and plan section was amended to exclude information that Hughes had pending murder and related charges after the jury could not reach a verdict, the original evaluation and plan section is attached to the agent's amended description of offense. It appears that inclusion of this original evaluation and plan section was unintentional. We remand for its deletion.

Affirmed but remanded for correction of the PSIR. We do not retain jurisdiction.

/s/ Colleen A. O'Brien
/s/ Karen M. Fort Hood
/s/ Thomas C. Cameron